IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

**FILED**

JUL 3 1 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

**ENTERED**

[JUL 3 1 2002]

NATION WIDE SERVICES

     Plaintiff,

v.                       CV 02-PT-1677-M

JAMES CAMPBELL, et al

     Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came on to be heard on July 23, 2002 on plaintiff's Application for Preliminary Injunction.   The only defendant appropriately served and noticed is defendant James A. Campbell.

Plaintiff complains that Campbell, a former employee of plaintiff, breached contract(s) with the plaintiff as follows:

(1) Campbell executed a valid, binding, and enforceable non-competition agreement (including a non-solicitation agreement) and a non-disclosure agreement in favor of Nation Wide.

(2) Campbell breached these covenants by directly competing against Nation Wide in the restricted area in violation of the terms of the non-competition agreement, by soliciting the customers on Nation Wide, by pirating the employees of Nation Wide, and by misappropriating the confidential and proprietary information of Nation Wide.

(3) As a result of this breach of contract, Nation Wide has been damaged by Campbell in the following ways:

        (a) Its confidential and proprietary information has been misappropriated;
        (b) It lost business and profits;
        (c) It lost a competitive advantage in the marketplace;
        (d) It lost the benefit of the covenants with Campbell;
        (e) It lost one or more customer relationship; and,

(f) It lost employees in which it had made time and effort in recruiting and training.

(4) Additional damages may be added by amendment as additional breaches discovered.

Plaintiff also complains that Campbell intentionally interfered with business, customers and employees of Nation Wide. The facts related to the two purported claims are the same. The interference claim likely has no foundation independent of the breach of contract(s) claims.

The court starts with a recognition that Alabama law controls. In this regard, the court notes the following statements in Robinson v. Computer Service Centers, Inc., 346 So.2d 940, 943 (Ala. 1977).

> Contracts restraining employment are looked upon with disfavor, because they tend not only to deprive the public of efficient service, but tend to impoverish the individual. Hill v. Rice, 259 Ala. 587, 67 So.2d 789 (1953). The courts will not specifically enforce, as of course, the naked terms of a negative covenant in a personal service contract restricting other employment, unless, supporting the affirmative promise, the employer has a substantial right unique in his business which it is the office of the court to protect, and the restriction laid upon the employee has a reasonable relevance to that result, and imposes no undue hardship. Hill v. Rice, supra.
>
> The testimony in this case shows that the directors of CSI, at the time they authorized the contract with Robinson which they seek to enforce, intended to dismiss him as soon as a replacement could be found.
>
> In Hill v. Rice, this court said each particular contract must be tested by determining on the facts of the particular case whether the restriction upon one party is greater than is reasonably necessary for the protection of the other party.
>
> Testing the restrictive contract here under the particular facts of this case, it is obvious that it would be inequitable and unreasonable to enforce a contract which the employer did not intend to keep.

The court will examine the facts of this case in the light of the Robinson holdings.

Facts

1. Campbell became employed by plaintiff on December 14, 2001. He effectively remained in the same employment status he had previously held with Ranger Security whose assets were purchased by plaintiff in December 2000. There was no non-competition agreement nor non-disclosure agreement executed by the parties at the time Campbell was hired by the plaintiff.

2. At the time plaintiff hired Campbell, he was considered to be a security officer[1] assigned to a Sav-A-Lot store in Gadsden, Alabama, and a "supervisor" of other guards. His role as a "supervisor" of other guards primarily involved hiring or attempting to hire guards to serve at some five to six customers of plaintiff in the Gadsden area and some other ministerial functions related thereto such as delivering checks, etc. His role as a "supervisor" was limited and involved a $1.50 per hour increase in pay over the pay of a guard.

3. Witness Fuller testified that he was told by plaintiff's relatively new area manager, Jeffrey Adams, in April 2001, that Adams intended to get rid of the old Ranger employees.[2] Plaintiff thereafter, on May 9, 2001, required Campbell to sign a Non-Competition Agreement (PX-1) and a Non-Disclosure Agreement (PX-2). At the time he signed the said agreements, Campbell was a "supervisor." The agreements provided that they were in consideration of Campbell's "continued employment" and training.[3] There is no evidence that Campbell ever received any significant training from plaintiff. His employment as a "supervisor" "continued"

_____

[1]The court will refer to security officers as guards.

[2]Adams did not refute this testimony.

[3]Campbell's employment was always "at will."

3

only to July 21, 2001.  On that date, his hourly rate was reduced from $7.50 to $6.00.[4]

4. The manager of Sav-A-Lot, for reasons unrelated to Campbell,  became substantially dissatisfied with plaintiff's providing of security services.  He determined to terminate that relationship, and, without prior suggestion by Campbell, asked Campbell if he could arrange for a new security service provider.  Campbell arranged for Stewart, the apparent primary owner of Special Forces, to have a security services relationship with Sav-A-Lot.  Campbell's main motivation was his own continued employment.[5]  There was no evidence that Campbell would have likely remained employed by plaintiff when plaintiff lost the Sav-A-Lot account.  Campbell is seventy-one years old and his only other income is social security.  His only recent employment has been as a guard.  Campbell was allowed to continue as a guard at Sav-A-Lot under the auspices of Special Forces.  His first month he was paid extra by Special Forces, likely because he had helped arrange its contract with Sav-A-Lot.

5. The only two customers in the Gadsden area which plaintiff has lost since Campbell was employed by it, are Sav-A-Lot and Regional Recycling.  Plaintiff acknowledges that Campbell had nothing to do with its losing its contract with Regional Recycling.  The new contract at Regional Recycling was given to K-9 Security (sic).  There is no evidence that Campbell has ever had any association with K-9.  Campbell did, after he learned that plaintiff's contract with Regional Recycling would not be renewed, contact its operations manager about getting the contract for Special Forces.  He was unsuccessful.  While plaintiff claims that

---

[4]Plaintiff has acknowledged that it did not require regular security officers or guards to sign agreements such as PX-1 and PX-2.  Campbell served as a "supervisor" only two months and  twelve days after he signed these agreements.

[5]Campbell's employment with plaintiff terminated on or about May 1, 2002.  He immediately became employed by Special Forces.

Campbell had something to do with its losing the Sav-A-Lot contract, the substantial evidence is

absolutely to the contrary.[6]  On one or more occasions Campbell tried to save the contract for

plaintiff.  His ultimate primary motivation was to save his own job.  Plaintiff was not caused any

injury by Campbell either with regard to Sav-A-Lot or Regional Recycling.  In both instances, the

customers became dissatisfied with plaintiff for reasons unrelated to Campbell and Campbell had

nothing to do with its losing those contracts.

6.  Plaintiff's other primary complaint against Campbell is that he purportedly has

recruited plaintiff's employees.  The only credible evidence is that (a) David Flarity applied for a

job with both plaintiff and Special Forces on or about May 19-20, 2002.  He went to work for

plaintiff and worked with plaintiff until plaintiff lost the Regional Recycling contract.  He has not

worked for Special Forces and is awaiting recall by plaintiff.  There is some evidence that

Campbell, knowing that plaintiff would not retain the Regional Recycling account, told Flarity

that he might give him a job at $5.15 per hour.  Flarity declined.  (b) There is a statement by a

Tim McClain as to which a purported call from Campbell is not authenticated.  He never

accepted any job with any firm with which Campbell had an association.[7]  Witness Horton left

plaintiff for two reasons.  He is sick and plaintiff lost the Regional Recycling contract.  Campbell

had nothing to do with either.  The court concludes that Campbell has not caused any injury to

plaintiff with regard to any of plaintiff's employees.

7.  The court has considered the affidavit of Jeffrey Adams.  It has some hearsay which

---

[6]Sav-A-Lot's manager, who was satisfied with Campbell as a guard, testified that he had decided that he had rather not have security than to have plaintiff providing it.

[7]For whatever it is worth, the court finds it to be incredible that Campbell wore a shirt with plaintiff's logo at Sav-A-Lot after his employment with it terminated.  He may have worn white shirts with both employers.

the court has not considered. The court concludes that plaintiff and Adams have both over-emphasized Campbell's purported knowledge of and/or use of purported confidential information allegedly obtained while he was a "supervisor."[8] The court will address some of this purported confidence:

(1) Knowledge of customer contact. There is no evidence of any such use. Any such knowledge could be acquired with a phone call by any competitor.

(2) Knowledge of security procedures. The only real issue is the time guards were needed and what the charge would be. Knowledge of where one walks and/or stands, etc. could be told to any guard in 30 minutes. There is no evidence that this allegation has <u>any</u> significance whatsoever.

(3) Billing rates. It is generally known that guards are paid minimum wage plus $.50 to $.90 cents. It is generally known that the company adds $2.00 to $3.00 dollars above. There is no evidence that any such information has been used. There is no evidence that Campbell had any reason to know what a customer was being charged except, possibly, one incidental disclosure unrelated to Campbell's job.

(4) Payment to guards. See above.

(5) Relationship with customers. Campbell's relationship was substantially at Sav-A-Lot as a guard, not a supervisor.

(6) Dealing with complaints. The evidence is that this was substantially addressed to Birmingham management.

The court will not continue with this analysis. Plaintiff and Adams have merely taken

---

[8]He was, at best, a low level supervisor receiving $1.50 per hour extra for that service.

6

insubstantial, menial activities of Campbell during a seven-month period and attempted to make it look like he was a significant manager. Among other evidence which belies the significance is the fact that it was determined that his services as a "supervisor" were no longer needed and that whatever he was doing could be handled from Birmingham.[9]  His services were deemed to be not worth $1.50 per hour.  Campbell's real duties, as a "supervisor" are better indicated by the following list of duties contained in Adams'affidavit.

        (a) scheduling the shifts for the Nation Wide security guards;
        (b) meeting with customers (either alone or by accompanying me) to address customer satisfaction issues;
        (c) training guards generally;
        (d) training guards on the specific security plan of our customers;
        (e) arranging for substitute guards in the event that guards were absent;
        (f) obtaining guard's uniforms from the Birmingham office of Nation Wide;
        (g) distributing uniforms to the guards;
        (h) returning uniforms to the Birmingham office when the guard ceased to be employed;
        (i) retrieving payroll checks from the Birmingham offices of Nation Wide; and
        (j) delivering payroll checks to the Nation Wide guards in the Gadsden area.

Even here, the "training" is over-emphasized.  The "training" consisted of telling guards where to stand and walk.  There is no substantial evidence of training or qualifications.

    (8) The court notes that Campbell was not a "supervisor" for the last nine plus months of his employment.

    (9) The Sav-A-Lot store is approximately 49 miles, "as the crow flies" from plaintiff's Birmingham area office.  It is probably more than 50 miles by automobile.

    (10) The places in the Gadsden area serviced by plaintiff did not require any unique security services.  They included a grocery store, a fast-food restaurant, a country club, a trucking

---

[9]Adams testified that Campbell's job, even as a "supervisor" did not include soliciting business.

company and a recycling facility.  In some instances, it was only a "presence" that was required.

They were not guarding nuclear energy plants or critical areas of any kind.  Again, there was no

evidence of any special training or specific qualifications.  Anyone who has ever seen a security

person at a store has seen a plaintiff-type employee.

Conclusions of Law

In <u>Devoe v. Cheatham</u>, 413 So.2d 1141, 1143 (Ala. 1982), the court stated:

> If an employee is in a position to gain confidential
> information, access to secret lists, or to develop a close relationship
> with clients, the employer may have a protectable interest in
> preventing that employee from competing.  But in the present case,
> DeVoe learned no more than the normal skills of the vinyl top
> installation trade, and he did not engage in soliciting customers.
> There is no evidence that he either developed any special relationship
> with the customers, or had access to any confidential information or
> trade secrets.  A simple labor skill, without more, is simply not
> enough to give an employer a substantial protectable right unique in
> his business.  To hold otherwise would place an undue burden on the
> ordinary laborer and prevent him or her from supporting his or her
> family.

Also see <u>Greenlee v. Tuscaloosa Office Products</u>, 474 So.2d 669, 671-72 (Ala. 1985), which cites

and quotes from <u>Devoe</u>, the court added:

> In the present case, the restriction is not enforceable because
> the former employer, TOPS, has no protectable interest in restraining
> Greenlee's employment.  The undisputed material facts show that
> Greenlee was hired by TOPS to service and repair copiers.  He had no
> management or sales duties.  He did not solicit new customers for
> TOPS, nor did he develop a special relationship with any of its
> existing customers.   In the course of his brief three-month
> employment there, Greenlee had routine access to TOP's service files
> containing certain information including the names of those
> customers who purchased copiers under continuing maintenance
> agreements and the respective costs of those agreements. He also had
> access to the price and service life information concerning Canon
> parts. Subsequent to this termination at TOPS, Greenlee was hired by
> Weatherford and worked there as a service technician for

approximately eight months until enjoined by the trial court. While there, he was in no way concerned with sales nor with the solicitation of new accounts. Greenlee never discussed with the officials at Weatherford, or anyone else, any of the information to which he had access while at TOPS, and there have been no reported instances of solicitation or interference with TOP's customers.

Under these facts, TOPS does not have a legitimate interest in restraining Greenlee's employment. As the court noted in <u>Devoe v. Cheatham</u>, <u>supra</u>, "a simple labor skill, without more, is simply not enough to give an employer a substantial protectable right unique in his business." Greenlee only repairs copiers; he does not sell them. He did not develop a special relationship with any of TOPS"s customers, and his brief access to its service files and parts information was merely incidental to the performance of his job. Furthermore TOPS has shown no injury as a result of his employment with Weatherford. Enforcement of this restriction would, therefore, impose an undue hardship on Greenlee and prevent him from supporting himself and his family, with no concomitant benefit to TOPS. <u>White Dairy Co. v. Davidson</u>, 283 Ala. 63, 214 So.2d 416 (1968).

In <u>Birmingham Television v. DeRamus</u>, 502 So.2d 761, 863-64 (Ala. Civ. App. 1986), the court stated:

....Generally, restrictive covenants not to compete are prohibited in Alabama. § 8-1-1(a), Code 1975. An exception to this general rule is that "one who is employed as an agent, servant or employee may agree with is employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer." § 8-1-1(b), Code 1975. This exception is subject to the general common law rule that contracts restraining employment are looked upon with disfavor, <u>Hill v. Rice</u>, 259 Ala. 587, 67 So.2d 789 (1953), and are subject to a test of reasonableness. <u>White Dairy Co. v. Davidson</u>, 283 Ala. 63, 214 So.2d 416 (1968). Each contract must be tested on the facts of that particular case as to whether the restriction upon one party is greater than necessary for the reasonable protection of a substantial interest of the other party. <u>Robinson v. Computer Servicecenter, Inc.</u>, 346 So.2d 940 (Ala. 1977). Courts will enforce the terms of a covenant not to compete if: (1) the employer has a protectible interest; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; and (4) the restriction imposes no undue hardship on the

9

employee.  James S. Kemper & Co. S.E. v. Cox & Associates, 434 So.2d 1380 (Ala. 1983) (hereinafter cited as Kemper).

. . . .

...Our supreme court has said that to have a protectible interest the employer must possess a substantial right in its business sufficiently unique to warrant the protection of post-employment restraint of an employee.  It is generally stated that justification for such restraint must lie in the prevention of the appropriation by the employee of valuable trade secrets, information and customer relationship gained or learned through his employment and which could be utilized in subsequent employment to the substantial detriment of the present employer.  Kemper v. Cox, supra, Devoe v. Cheathem, 413 So.2d 1141 (Ala. 1982).  Our review of the evidence finds it insufficient to support the finding of a substantial protectible interest of Channel 42 in restraining the employment of DeRamus by Channel 6.  We consider that the evidence as to alleged trade secrets, confidential information and customer lists given to or learned by DeRamus during his brief two-month employment were not so substantial or unique as to rise to the status of protectible interest, but in fact, were matters or information common to others in the business and were known to or easily obtainable by such others.  Greenlee v. Tuscaloosa Office Products and Supply, Inc., 474 So.2d 669 (Ala. 1985).  Contracts restraining employment are disfavored because they tend not only to deprive the public of efficient service, but tend to impoverish the individual.  Kemper, supra.  To entire restrict the defendant from employment as a television time salesman in the Birmingham environs for a period of six months is not reasonably related to Channel 42's protectible interest and imposes a severe and undue hardship on the defendant who is twenty-five years old and recently married.  The restriction is even more unreasonable in light of the fact that DeRamus could be discharged at any time without cause and without recourse.  Rice v. United Insurance Co. of America, 465 So.2d 1100 (Ala. 1984).  We find the contract not to compete in this case to be invalid and an unfair restraint of personal services.  See § 8-1-1, Code of Alabama 1975.  Thus the trial court erred as a matter of law.  Also see Calhoun v. Brendle, Inc., 502 So.2d 689 (Ala. 1987).

Also see Chavers v. Copy Products Co., Inc. 519 So.2d 942 (Ala. 1988) where the skill was greater than here.

10

The case of Seymour v. Buckley, 628 So.2d 554 (Ala. 1993) is obviously distinguishable. There the defendant, prior to his association with plaintiff knew nothing about a specialized process called "paintless dent removal." The plaintiff spent $18,500.00 for defendant's five weeks training in California. The court stated:

> . . . . The evidence that the PDR process is unique within the automotive body repaid industry included Buckley's contract for Seymour's training with Matteson, Inc.; the testimony of a longtime Birmingham automotive body repairman, John Mitchell; and the testimony of Terry Koebbe of Dent Wizard International. Seymour's own witness, Robert L. Smith admitted that he had learned the PDR process only after agreeing to keep it a secret and paying $6,600. The proprietary nature of the PDR process makes it a proper subject of an injunction. See Indiana Code § 24-2-3-2, defining trade secrets, and Indiana Code § 24-2-3-3, providing for injunctive relief to prevent the misappropriation of trade secrets.

6280 So.2d at 558.

Ex Parte Caribe, U.S.A., Inc., 702 So.2d 1234 (Ala. 1988); Unisource World-Wide, Inc. v. South Central Ala. Supply, LLC, 199 F.Supp 2d 1194 (MD Ala. 2001); and C ark v. Liberty National Life Insurance Company, 592 So.2d 564 (Ala. 1992) are also clearly distinguishable.

The activities of security officers and their "supervisor" are certainly not unique and they require little, if any, training. Their activities are more akin to Wal-Mart greeters. The plaintiff and Adams have attempted to take a simple job and convert it into something complex by merely parroting language from other cases with distinguishable circumstances. It is tantamount to attempting to make a 1985 Chevrolet look like a 2002 Mercedes by referring to a motor, chasis, windshield, tires, etc. The demeanor of the guard witnesses at trial suggest that the primary qualification of a guard is to be relatively nice and punctual. The contracts which plaintiff lost related only to these two factors as to guards other than Campbell.

The court ultimately concludes that there is no likelihood that plaintiff will prevail on the merits. The claims border on being frivolous and, if there is continued pursuit, malicious. There would be substantial hardship to Campbell if, at his age, he is unable to continue the only job he has apparent qualifications(s) for. On the other hand Campbell has caused no injury to plaintiff and there is no evidence that he is likely to do so. Public interest weighs against the plaintiff. There is no irreparable damage to plaintiff. The application will be denied.

This the 30TH day of July, 2002.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**